UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| HEDSTROM CORPORATION, et al., ) | CASE NO. 04 B 38543 |
| ) | |
| Debtor ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE
### FEES AND EXPENSES OF CONWAY DEL DENIO GRIES & CO., LLC

On October 18, 2004, Hedstrom Corporation and certain of its affiliates ("Hedstrom Companies" or "Debtors") filed this bankruptcy proceeding under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C. Since the petition date, the Hedstrom Companies have been administering their estates as debtors in possession pursuant to 11 U.S.C. §§ 323, 1107, and 1108. As of the petition date the Hedstrom Companies financed their operations pursuant to a senior secured loan with a group of banks for which Credit Suisse First Boston, N.A. serves as Agent ("Term Lenders"). The Hedstrom Companies also financed their operations through a revolving loan with Congress Financial Corporation, Central ("Congress").

On September 13, 2004 Congress retained Conway Del Genio Gries & Co., LLC ("Conway") as their financial consultants. On November 17, 2004, pursuant to 11 U.S.C. § 506(b), Congress requested $253,098.20, the total fees and expenses allegedly incurred as a result of Conway services. On December 7, 2004, the Term Lenders filed an Objection to the Fees and Expenses of Conway (the "Objection"). In the Objection, the Term Lenders argue that the fees and expenses are unreasonable and unjustified given circumstances of the Chapter 11 case, are not covered under terms of the Prepetition Loan Agreement, are not described with sufficient detail, and should not be satisfied from proceeds of the remaining Congress Collateral

to the detriment of the Hedstrom Companies and their estates. On December 9, 2004 the Official Committee of Unsecured Creditors (the "Committee") filed a pleading joining in and adopting the Objection. Trial was set on the issues thus posed. The issues were presented to the Court for adjudication, thereby triggering a contested proceeding under Rule 9014 Fed.R.Bankr.P.

Prior to trial, Congress filed a Motion in Limine to Bar Evidence in Connection with the Prepetition Fees and Expenses of Conway ("Motion in Limine"). In the Motion in Limine, Congress argues that because the Term Lenders and the Committee did not file an objection pursuant to § 502 of the Bankruptcy Code, but rather under § 506(b) of the Bankruptcy Code, they could only object to Conway's postpetition fees and expenses. It was announced from the bench on June 3, 2005 that the Motion in Limine would be denied for reasons to be set forth later. Reasons for that ruling are discussed below.

Following trial, the Court now makes and orders entry of the following Findings of Fact and Conclusions of Law, pursuant to which judgment will separately enter entirely denying the fees and expenses of Conway, and also denying the Motion in Limine.

## FINDINGS OF FACT

1.  Congress and Hedstrom Companies entered into a Loan and Security Agreement ("Prepetition Loan Agreement") on July 31, 2001.

2.  The Prepetition Loan Agreement provides that Congress may charge the Debtors for all costs related to the liquidation of the Debtors' obligations, "costs and expenses of preserving and protecting the Collateral," "costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Collateral Agent, selling or otherwise realizing upon the Collateral" and "all out-of-pocket expenses and

- 2 -

costs" incurred by Congress for periodic field examinations of its collateral, "plus a per diem charge at the rate of $650 per person per day." (Prepetition Loan Agreement ¶ 9.16).

3. On September 13, 2004 Congress retained Conway as their financial consultants for a flat fee of $125,000 per month. An engagement letter was executed describing the objectives and terms of engagement. That engagement contract was not approved by Committee, Debtors, or by the Court.

4. Conway had prior, detailed knowledge of the Debtors' business, including its inventory, from its prior engagement by the Debtors in September 2003 during which it prepared, in connection with MorganRidge Group LLC, a 106-page report consisting of detailed analyses of all facets of the Debtors' businesses, including the pricing and cost of the Debtors' inventory.

5. No later than October 6, 2004 Congress provided a "DIP Term Sheet" to the Debtors, which contained terms pursuant to which Congress would permit the use of its cash collateral and provide debtor-in-possession financing in order to allow the Debtors to proceed with Chapter 11 cases and liquidate their assets.

6. On October 19, 2004 an Order was entered authorizing Debtors to: (1) use cash collateral on an interim basis; (2) incur postpetition debt; and (3) grant adequate protection and provide security and other relief to Congress as lender ("Interim DIP Order").

7. Subsequently, on November 17, 2004, an Order was entered authorizing Debtors to: (1) use cash collateral; (2) incur postpetition debt; and (3) grant adequate protection and provide security and other relief to Congress as lender ("Final DIP Order"). In the Final DIP Order, Congress acknowledged that the liquidation value of Congress' Collateral was at least $15,000,000. (Final DIP Order at ¶ D).

8. Accordingly, as of the petition date, Congress was oversecured by at least 33% of the value of its claim.

9. The Debtors financed their operations through the Prepetition Loan Agreement. Congress has a first lien in accounts receivables, inventory, and their proceeds (the "Congress Collateral"), as well as a second lien in the Term Lenders' Collateral. As of the petition date, the principal balance of the Prepetition Loan Agreement was approximately $9,000,000, excluding letter of credit obligations, and $11,000,000 including letter of credit obligations.

10. The Debtors also financed their operations pursuant to a senior secured loan agreement (the "Prepetition Term Credit Facility") with the Term Lenders. The Term Lenders have a first lien in the Debtors' equipment, general intangibles, real estate and their proceeds (the "Term Lenders' Collateral"), as well as a second lien in the Congress Collateral.

11. On or about the bankruptcy petition filing date, the Debtors executed an agreement to sell the Debtors' Ball Bounce and Sport division (the "BBS sale"). On October 29, 2004 an order was entered approving the BBS Sale. Congress received approximately $7,600,000 from the proceeds of this sale.

12. On November 5, 2004 the revolver portion of the Prepetition Debt was paid in full and Congress' only remaining exposure was comprised of certain letter of credit obligations.

13. On November 15, 2004 Congress filed a proof of claim in the Debtors' bankruptcy estates in the amount of $11,541,051.56. The deadline for objecting to the proof of claim was January 17, 2005.

14. On November 17, 2004, and in compliance with Section 6(a) of the DIP Order, Congress sent a § 506(b) request seeking fees and expenses for services rendered by Conway in connection with these bankruptcy cases.

15. For services rendered from September 13, 2004 through October 17, 2004 Conway billed Congress $145,161.29 in fees and $26,445.19 in expenses, for a total prepetition bill of $171,606.48 (the "Prepetition Fees").

16. For services rendered postpetition, from October 18, 2004 through November 5, 2004 Conway billed Congress an additional $76,612.90 in fees and $4,878.82 in expenses, for a total postpetition bill of $81,491.72 (the "Postpetition Fees").

17. On December 7, 2004, the Term Lenders filed its Objection to the Fees and Expenses of Conway. The Objection opposed the Prepetition and Postpetition Fees of Conway.

18. On December 9, 2004 the Committee filed a Joinder in the objection.

19. At the hearing held on the subject issues, Congress and Conway offered as evidence of services performed only oral testimony outlining such work and a three-page "summary" describing its work. Not a single piece of work product arising out of work pertaining to such services was offered in evidence, not any reports, not any analyses, not any compilations of data, not any recommendations. Nothing.

20. Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E). Reference of the matters and issues herein were made to the bankruptcy court under District Court Internal Operating Procedure 15(a). Venue lies in this District under 28 U.S.C. § 1409(a).

**Congress' Motion in Limine to Bar Evidence in
Connection with the Prepetition Fees and Expenses of Conway**

In the Motion in Limine, Congress argues that the Committee and the Term Lenders should be barred from presenting any evidence regarding Conway's prepetition fees and expenses. Congress cites to Stipulation C and paragraph 7(a) of the Final DIP Order to support this argument. In Stipulation C, Debtors stipulated that Congress' prepetition debt was an allowed claim in an amount not less than $11,184,250.78. (Final DIP Order Stip. C). Thereafter, in paragraph 7(a) of the Final DIP Order, the Debtors agreed not to object to such stipulation. (Final DIP Order Stip. ¶ 7(a)).

The Committee and the Term Lenders do not dispute this allowed prepetition amount. However, they do dispute the entire amount asserted in the proof of claim filed by Congress on November 15, 2004 in the amount of $11,541,051.56. This amount exceeds the amount stipulated to in the Final DIP Order by over $350,000. This amount also includes over $304,000 in unidentified "interest, fees, costs, and other charges" and apparently included the objectionable Conway prepetition fees. Further, the stipulation as to amount of $11,184,250.78 as Congress' debt did not reference or agree to particular amount of fees or expenses to be paid to Conway in connection with its retention by Congress.

Because the Committee and Term Lenders only agreed to the allowed secured claim of $11,184,250.78, and did not agree to the fees and expenses charged by Conway, they were permitted to present evidence in connection with the Conway prepetition fees and expenses, and the Congress Motion in Limine was earlier declared by the Court to be without merit, and will now be denied.

### The Committee's Joinder Is Deemed Timely

Congress argues that the Committee's Joinder in the Objection was not timely filed and should be overruled for that reason alone. The Term Lenders filed Objection to the § 506(b) request on December 7, 2004, the last day for filing such objection. On December 9, 2004, two days later, the Committee filed a Joinder in the Objection and adopted the same as its own. Even though the Joinder was not filed within the applicable period for filing an objection to the § 506(b) request, Congress has not articulated any undue prejudice caused by the Joinder, and no persuasive reason was shown why the Committee should not be allowed to rely on the Term Lenders timely filed Objection in which it joined. See Chicago Ins. Co. v. Abstract Title Guaranty Co., 2004 WL 2750258, at *2 (S.D. Ind. Oct. 12, 2004).

### Retention of Conway

The Loan and Security Agreement between Congress and the Hedstrom Companies permitted the hiring of a financial advisor. The Loan and Security Agreement provided that Congress could charge the Debtors for all costs related to the liquidation of the Debtors' obligations, "costs and expenses of preserving and protecting the Collateral" and "costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of the Collateral Agent, selling or otherwise realizing upon the Collateral." (Prepetition Loan Agreement ¶ 9.16). It is thus undisputed that Congress was entitled to hire Conway to perform certain specified financial advising services.

Mr. Linderman, Director of Congress, testified that one of the main reasons in hiring Conway was its fear that Debtors' current management was going to abandon the company. (Trial Tr., 29-30, June 3, 2005). However, the testimony of Mr. Tuley, the President and CEO of the Hedstrom Companies, does not indicate that he planned on abandoning the company.

(Trial Tr., 120, June 3, 2005). Rather, Mr. Tuley testified that he intended to remain in a management role during a Chapter 11 liquidation, but recognized that his presence was only likely needed if there was an orderly liquidating process under Chapter 11. (Trial Tr., 130, June 3, 2005).

In addition to Mr. Tuley's testimony indicating that he did not plan on leaving the company, his cooperation prior to the petition date demonstrates that he did not intend on abandoning his management role. Prior to the petition date, Mr. Tuley worked with Congress in preparation of various documents, including cash flow forecasts, liquidation analyses, and a Chapter 11 budget. (Trial Tr., 120-122, June 3, 2005). Nevertheless, Congress claims that it felt the need to retain Conway.

**There is no Credible Evidence that the Monthly Fee Charged Was Market Rate**

Pursuant to the engagement letter between Conway and Congress dated September 13, 2004, it was agreed that Conway would be paid a monthly fee of $125,000. Terms of that letter were not agreed to by the Committee or Debtors, and it was not presented to the Court for approval.

Mr. Stengel, senior managing director at Conway, testified that the flat monthly rate of $125,000 charged by Conway is competitive within the market. (Trial Tr., 88, June 3, 2005). However, no evidence was presented to corroborate this self-serving testimony. Evidence could have been presented if it existed that compared the services provided in this case to other situations in which Conway was retained to do similar work and billed and was paid on basis of flat fees without accounting for personnel time worked or work product produced. In addition, cases in which the same number of employees was required could have been compared to determine whether the fees charged in this case were in fact competitive within the market.

However, no such corroborative evidence was presented. Therefore, there was no persuasive evidence to indicate that the $125,000 monthly fee charged here by Conway was in fact competitive within the historic market rates actually billed and collected by Conway, and such cannot be inferred from the self-service uncorroborated testimony introduced. Therefore to extent that the application rests on a flat fee contract, it must be denied.

## 11 U.S.C. § 506(b)

Under § 506(b) of the Bankruptcy Code, to the extent that an allowed secured claim is secured by property the value of which is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose. A secured creditor can obtain payment of its fees and expenses if the following factors are satisfied: (1) the creditor has an allowed secured claim; (2) the claim is oversecured; (3) the agreement between the debtor and the secured creditor provides for payment of such fees and expenses; and (4) the fees and expenses are reasonable. 11 U.S.C. § 506(b). See In re Stoecker, 114 B.R. 980, 983 (Bankr. N.D. Ill. 1990). In this case, Congress has an allowed secured claim; the claim is oversecured; and an agreement exists between Congress and the Debtors allowing payment for fees and expenses. Therefore, the remaining issue is whether Congress' request for the fees and expenses of Conway is "reasonable" as mandated by § 506(b). Under § 506(b), the burden of proving reasonableness of fees falls on Congress which requested the fees.

Broad discretion exists to determine what constitutes "reasonable" fees, and whether they are reasonable in both scope and amount. Stoecker, 114 B.R. at 983. Courts frequently disallow or reduce fees sought by secured creditors on finding that the work performed was unnecessary or excessive. Id. Several factors must be considered when determining the reasonableness of

-9-

fees under § 506(b), being some of the same factors used when analyzing fee requests submitted under § 330 of the Bankruptcy Code  In re Lund, 187 B.R. 245, 251 (Bankr. N.D. Ill. 1995).

Pursuant to 11 U.S.C. § 330(3) (as recently amended):

> In determining the amount of reasonable compensation to be awarded *to an examiner, trustee under chapter 11, or professional person*, the court shall consider the nature, the extent and the value of such services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) With respect to a professional person, whether *the person is bond certified or otherwise has demonstrated skill and experience in the bankruptcy field*; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

[Recent amendments in italics]

The Court has broad discretion to determine what constitutes a reasonable fee and should look at whether the Creditor's "fees and costs fall within the scope of the fee provision, whether the [Creditor] took the kind of reasonable actions a similarly situated creditor would have taken, and whether such actions and fees were outside the range so as to be deemed unreasonable." In re Lund, 187 B.R. at 251.

It also has been held that Bankruptcy Rule 2016 governs claims for fees brought pursuant to § 506(b) of the Bankruptcy Code. Colliers on Bankruptcy ¶ 2016.04 at 2016-6 (15th ed. 2005). See In re Dooley, 41 B.R. 31 (Bankr. N.D. Ga. 1984). See also In re Lane Poultry of Carolina, Inc., 63 B.R. 745 (Bankr. M.D.N.C. 1986). Thus, Bankruptcy Rule 2016(a) requires a

detailed statement of the services rendered, expenses incurred, amount requested, and a statement of what payments have actually been made or promised in connection with those services and expenses. In re Lane Poultry of Carolina, Inc., 63 B.R. at 749-750.

In making its § 506(b) request, Congress provided two one-page invoices listing the number of days Conway allegedly worked from September 13, 2004 through November 5, 2004. Those invoices do not provide information regarding any specific work performed during the specified time periods, nor do they provide information about what tasks were performed and how long each took. Mr. Linderman admitted in his testimony that the invoices do not specify what was done each day and how many hours were worked. (Trial Tr., 57-58, June 3, 2005). Regarding why Conway did not provide more descriptive time entries, Congress stated, "Conway, like many financial advisors, charges a monthly flat rate, and therefore does not, in the ordinary course of its business, provide detailed time entries of the work it performs." (Congress' Reply at 3-4).

The Bankruptcy Code and applicable Rules required a detailed statement of services rendered and expenses incurred to determine whether the requested fees and expenses are reasonable. Fed. R. Bankr. P. 2016; Local Rule N.D. Ill. R. Br. 5082-1.

The lack of information provided in the invoices prompted the Committee and the Term Lenders to request additional information regarding the services performed by Conway during the relevant period. In response, Congress provided a similarly uninformative three-page "summary of services" (appended as **Exhibit** to this Opinion). Among several listed activities, the "summary of services" states that Conway held multiple meetings with key members of management and management's advisors. However, Mr. Tuley testified that he only recalled one incident with representatives from Conway in which he was advised to include an additional

$50,000 in the budget for liquidation costs. (Trial Tr., 122, June 3, 2005). He also testified that there was no "regular or frequent interface" with representatives from Conway. (Trial Tr., 123, June 3, 2005). Thus, it does not appear that Conway performed all of the activities vaguely listed in the "summary of services."

Regarding services provided by Conway, Mr. Stengel testified that Conway focused on creating a budget that could be used for debtor-in-possession financing. (Trial Tr., 84-85, June 3, 2005). Mr. Stengel also testified that he advised Debtors' about various issues in order to reconstruct the budget. (Trial Tr., 85-86, June 3, 2005). He further testified that Conway monitored the cash flow of the business and assisted the Debtors in their first development of the reporting that was required under the debtor-in-possession financing agreement. (Trial Tr., 86, June 3, 2005). He stated, "We worked with both Congress and the company to iron out the issues that existed in the budget at that time to be able to move forward." (Trial Tr., 86-87, June 3, 2005). Mr. Tuley, however, could only recall one incident in which he was advised on the budget. (Trial Tr., 122, June 3, 2005). Moreover, no time sheets, invoices, or detailed billing statements corroborate the alleged activities performed by Conway.

Furthermore, Conway charged the flat monthly fee of $125,000 for its services irrespective of the number of employees or amount of time each spent on tasks related to the Debtors. (Trial Tr., 95-96, June 3, 2005). When Conway was initially retained, it assumed the need for four people to work on this matter and thus based its fee structure accordingly. (Trial Tr., 89, June 3, 2005). However, almost immediately after arriving at the Debtors' facilities in Arlington Heights, Conway determined that only three employees would be needed and sent an employee home. (Trial Tr., 89-90, June 3, 2005). Mr. Stengel testified that the additional employee was sent home when he realized that "we weren't going to have sufficient work to

keep anybody really busy." (Trial Tr., 82, June 3, 2005). Despite realizing that this project would require the work of one less employee, Conway did not reduce its fee structure of $125,000 per month.

Conway essentially "lumped" all of the services it allegedly provided into a three page "summary of services." In doing so, one cannot determine the necessity of each service and whether the time expended on each task was reasonable. Because it is impossible to ascertain the amount of time spent on specific tasks and which tasks were performed, the requested fees cannot be deemed reasonable based on evidence of work performed. "Lumping of services into one time entry is disapproved of by courts because it prevents a court from determining the necessity of each service and whether the time expended on individual items were reasonable." Lund, 187 B.R. at 251. Courts that have been faced with lumped time entries have either denied the compensation requested, see, e.g., In re Poseidon Pools of America, Inc., 180 B.R. 718, 75-751 (Bankr. E.D.N.Y. 1995), or made an adjustment for all of the lumped time entries reducing compensation for such entries by a certain percentage. See, e.g., In re Adventist Living Centers, Inc., 137 B.R. 701, 706 (Bankr. N.D. Ill. 1991); Lund, 187 B.R. at 251-252. Lumping of services together prevents one from determining whether the time expended on each task was reasonable. Lund, 187 B.R. at 256.

It is nearly impossible to assess whether the fees charged by Conway were reasonable in light of not knowing what specific services were provided. With such vague and uninformative descriptions, one can only speculate as to the amount of time and work performed for the benefit of Congress. In addition, evidence in the form of completed reports or project descriptions were not submitted by Conway to demonstrate work product. Absent any detailed records or evidence of work product, there is no way of determining that the fees requested were reasonable for the

- 13 -

tasks performed. Therefore, absent such evidence, the fees incurred by Conway cannot be deemed reasonable. Since, as earlier discussed, the flat fee contract cannot support the application, the application must be entirely denied.

### Conway's Expenses are not Shown to be Reasonable and Necessary

Congress' § 506(b) request contains approximately $30,000 worth of expenses for the period from September 13, 2004 through November 5, 2004. Included in the expenses requested is a round-trip airfare for Conway employee Mr. Soo. Mr. Soo flew to Debtors' Arlington Heights facilities for one day before being sent home for lack of substantive work. (Trial Tr., 102-103, June 3, 2005). Nevertheless, Congress seeks to recover over $1,000 in expenses for the airfare of a Conway employee who did not work on any tasks related to the Hedstrom Companies.

Moreover, from the expenses submitted Mr. Stengel (senior managing director at Conway) could not specifically identify and explain various expenses, including airfare and ground transportation included in the § 506(b) request. (Trial Tr., 100-101, June 3, 2005). Specifically, Mr. Stengal was asked whether he could determine whether transportation fees were for rental cars or limousines, to which he responded that he did not know. (Trial Tr., 105, June 3, 2005). Indeed, if an employee working on the tasks related to this case cannot explain or determine how expenses were incurred, it would certainly be impossible for other interested parties to determine whether the expenses were reasonable. Because Congress has presented insufficient evidence that the requested expenses are reasonable, Congress' § 506(b) request for expenses incurred by Conway will be denied.

## CONCLUSION

For the foregoing reasons, the Committee's and the Term Lenders Objection to the Fee and Expenses of Conway is sustained. A separate order entirely denying such fees and expenses will be issued in conformity with this decision.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 21st day of November 2005

Conway Del Genio Gries & Co., LLC
Summary of Services for Hedstrom Corporation Engagement

When reviewing the summary below, please take note that CDG dedicated a senior team of professionals comprised of a Senior Managing Director, a Managing Director and an Associate to this engagement.

Additionally, while CDG did not track or bill its services on an hourly basis, to the extent it is helpful in understanding a portion of the time CDG worked on this engagement, we have identified the days CDG was on-site and we estimate that on average CDG works beyond normal business hours and in this situation generally arrived at the Company at 8:00 am and departed after 6:00 pm.

CDG professionals were on-site at Hedstrom Corporation in Arlington Heights, Illinois for 18 days from the period of September 13, 2004 through October 17, 2004 and 5 days during the post-petition period of October 18, 2004 through November 5, 2004. I would reiterate that on-site work was only a portion of the time CDG's team worked on this engagement and is not our assessment of the overall effort that was required in providing services to the client, as we performed significant work in our office in New York as well.

The following is a detailed outline of the overall services provided:

CDG reviewed the Company's strategy to maximize value via multiple restructuring alternatives. CDG held discussions with senior management regarding their views of the following:

- Sale of certain or all assets of the Company
- Partial sale of assets and stand-alone plan
- Controlled winddown of operations
- Liquidation /closedown of the operations

CDG was asked by Congress to familiarize itself with the Company; in order to be in a position to manage / run a close-down of the operations, if the situation deteriorated to that level.

- Quickly assessed management, collateral and issues by location
- Determination of staffing needs
- Determination of additional professional support by functional expertise
- Determination of optimal approach to maximizing liquidation of Congress collateral while preserving other asset values

1

Committee Exhibit 10

**EXHIBIT**

#### Assessment of 13 week cash flow forecast

- Review of all revenue and expense categories
- Multiple meetings held with key members of management and management's advisors
- Shared ideas for improvement of forecasting and reporting with management

#### Collateral assessment (US based and Canadian)

- Reviewed all collateral by type, condition, location etc. with a view to managing or monitoring realization of values
- Coordinate efforts with Ozer (performing collateral audit) to ensure there was no repetition of services

#### Evaluation of collateral realization process

- Asset sales
- Winddown vs closedown

#### DIP budget analysis and input

- Multiple meetings held with key members of management and managements advisors
- Continual assessment of extremely "rough" wind-down budgets for operations, which were not of a quality that a lending institution could base credit decisions upon
- Comments were regularly provided to management to assist in preparation of budgets
- Detailed independent assessment of personnel requirements by location for cost effective winddown

#### Assessment of Bids for certain assets of Hedstrom

- Assessment of multiple bids for Hedstrom assets including review of the following:
    o APA's
    o Purchase price adjustments
    o Bid structure

#### Surcharge Analysis

- Detailed assessment of costs associated with preservation and realization of collateral by lender

2

**Monitoring of the Company's progress in implementing strategies pursued and general performance of the business**

- Monitoring of M&A process
- Assessment of collections and receipt projections data several times weekly
- Review of status with major accounts and collections associated with certain large vendors such as TRU

3